COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Beales and Malveaux
Argued at Richmond, Virginia

UNPUBLISHED

TATEANA ACACIA WELLS

v.      Record No. 0896-18-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY BENNETT MALVEAUX
JUNE 18, 2019

FROM THE CIRCUIT COURT OF APPOMATTOX COUNTY
S. Anderson Nelson, Judge

F.E. "Tripp" Isenhour, III (Caskie & Frost, on brief), for appellant.

Leah A. Darron, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

Tateana A. Wells ("appellant") was convicted of grand larceny, in violation of Code

§ 18.2-95, grand larceny of a firearm, in violation of Code § 18.2-95, and felony eluding, in

violation of Code § 46.2-817.[1]  On appeal, she argues that the trial court erred in denying her motion

to strike the eluding offense based upon the Commonwealth's failure to prove venue.  Further, she

contends that the trial court erred in denying her motion to strike the second-charged larceny under

the single larceny doctrine.  For the following reasons, we affirm.

I.  BACKGROUND

On the evening of June 16, 2017, Elizabeth Iannaco and her boyfriend, Nathan Owen,

held a party at their residence, located on Old Grist Mill Road in Appomattox County.  About an

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant was also convicted of burglary, in violation of Code § 18.2-89, and robbery, in violation of Code § 18.2-58.  Appellant does not challenge these convictions on appeal.

hour into the party, police arrived and told them to shut down the party, and they complied. Everyone left except for a few friends.

About ten minutes after everyone had left, four individuals, later identified as appellant and her three codefendants, Tremaine Green, Arien Pollard,[2] and Octavius Wells, arrived at the home in a red Mitsubishi Lancer. They asked if they could stay because they had heard about a party happening, and Iannaco allowed them to stay.

Everyone "h[u]ng out for a little bit," with people coming in and out of the home. Approximately twenty to thirty minutes after appellant and her codefendants arrived, Iannaco went into her bedroom and saw that her PlayStation video game console was missing. She told Owen about the missing item, and he asked each person if they had stolen the PlayStation. Appellant and each of her codefendants denied taking it.

After Iannaco saw that her PlayStation was missing, she was in the living room when she saw a gun and some bullets drop out of Tremaine Green's pocket. At that point, Owen asked everyone to go outside. He then brought a rifle he owned outside and showed it to Green. Green asked to hold the gun, and when Owen gave it to him, Green ran with it into the woods. Owen chased Green through the woods and eventually came in contact with him on the road. Green told him that the gun was in the car, so Owen searched the car. Owen did not find the gun, but he did find the missing PlayStation in the trunk.

When appellant and her codefendants came outside and asked Owen why he was looking in the trunk, he told them to "have a nice night," entered the house, locked the doors, and turned off the lights. Owen also retrieved a shotgun with which to defend himself because he knew that Green had a weapon. Appellant and her codefendants then got into their car and drove halfway

_____

[2] See Pollard v. Commonwealth, No. 1137-18-2 (this day decided).

- 2 -

down the driveway, but subsequently returned to the house.[3]  Once back at the house, one of the

men went to the door and stated in a "very demanding" manner that he needed to get his phone.

He asked Owen and Iannaco to come outside and help look for it.  Owen told them that they did

not have the phone and that they had called the police.  Appellant and her codefendants forced

open the door and entered the house.  Tremaine Green was holding a pistol in his hand when he

entered.

Owen and Iannaco were in the kitchen at that time.  Iannaco testified that the layout of

the house was such that "when you walk in the door you walk into the living room, which is

open and it flows right into the kitchen . . . [i]t's almost like one room."  When they entered the

house, one of the individuals "ran" to Owen and took his shotgun from his person.[4]  After

disarming Owen, appellant and her codefendants told everyone to get out of the house.  Owen

went outside and ran into the woods.

Iannaco did not immediately go outside.  She first saw appellant take two PlayStation

controllers, an Xbox One video game console with two controllers, about ten video games, and a

television from the living room.  Appellant made two or three trips to her car with the items.

Iannaco then went into her bedroom and saw a friend, Cash Neighbors, before she continued into

the bathroom, which was located "right off [from] the bedroom."  At some point, Iannaco saw a

man come into the bathroom.  He ordered her to go outside, and she did.  There, she ran into the

woods and then watched appellant and her codefendants drive down and exit the driveway in the

red Mitsubishi Lancer.

---

[3] Iannaco testified that they drove halfway down the driveway then drove back up to the house.  Cash Neighbors, who was inside the home with Owen and Iannaco, testified that they put the car in park halfway down the driveway, then got out of the car and walked back towards the house.

[4] Iannaco testified that Octavius Wells was the person who took the shotgun from Owen. Owen testified that appellant took the shotgun from him.

Neighbors was in the kitchen with Iannaco and Owen when the door was forced open. He initially hid behind a corner, but at some point went into the bedroom and retrieved a rifle belonging to Owen from under the bed. He then went into the bathroom connected to the bedroom. Octavius Wells opened the bathroom door, saw that Neighbors had a rifle, and left the bedroom. Neighbors went back into the bedroom to "st[an]d his ground." Neighbors was alone in the bedroom at this point, but was then "disarmed" by either Octavius Wells or Arien Pollard when they entered the bedroom. After he was disarmed, Neighbors got into a fistfight with Wells and Pollard. Green and appellant came into the bedroom, and all four individuals "ganged up on" Neighbors and "beat [him] to the ground." They took Neighbors' phone and searched his pockets, and then started "beating" him again.

In the early morning hours of July 17, 2017, Deputy Sean Burton with the Appomattox County Sheriff's Office responded to a call reporting a home invasion/robbery. Burton received a description of a red vehicle and its occupants and was advised that the "vehicle was leaving the driveway [and] taking a left out of the driveway." He arrived at the reported location, and he saw a vehicle matching the description "right there just below the driveway." Burton was on Old Grist Mill Road when he saw the vehicle in the driveway. Once he saw the vehicle, the deputy "immediately" turned on his blue lights and "ease[d] over in front of the vehicle to . . . get it to stop." Instead of stopping, the car went around Burton's vehicle through the grassy shoulder of the road and continued down Old Grist Mill Road at a high rate of speed.

Burton caught up with the vehicle after half a mile and turned on his siren. He then pursued the vehicle for about seven or eight miles "through the back roads there," at speeds up to seventy or eighty miles an hour. When asked if the "back roads [were] . . . your typical back roads out in the county," Burton replied, "[y]es, very curvy, you know, narrow, very curvy roads, sharp turns." Burton saw the occupants of the back seat making "furtive movements," and at one

- 4 -

point saw "something c[o]me out of the vehicle." The rear passenger door was ajar during most of the pursuit.

After going about eight miles, both vehicles reached Richmond Highway. Burton testified that they traveled on "a number of roads," and had "started on Old Grist Mill, went to River Ridge to Poorhouse, to Hicksboro, to Swan and eventually to 460." When asked which way the vehicle went on "Richmond Highway, commonly known as Route 460," Burton stated they turned right, which was "heading back towards Appomattox and Lynchburg." At this point, Burton forced the vehicle off the road. Burton identified appellant as the driver of the vehicle.

At the conclusion of the Commonwealth's case-in-chief, appellant moved to strike the evidence on the larceny of a firearm charge, arguing that the single larceny doctrine applied. She also moved to strike the evidence on the eluding charge because the Commonwealth did not produce evidence establishing venue in Appomattox County.

The trial court denied both motions to strike. Regarding venue, the court noted that "the [d]eputy testified that he got right to where the drive was and that had already been identified as being in Appomattox County." The court also found that the single larceny doctrine did not apply because "there were two separate and distinct times that this occurred." First, "[t]he shotgun . . . and the items in the living room were taken at one point." Then, "[t]here was an intervening time period" during which Iannaco and Cash went into the bathroom, and then the codefendants came in at "that time the gun was taken . . . [s]o that's two distinct actions."

Appellant was found guilty of grand larceny, in violation of Code § 18.2-95, grand larceny of a firearm, in violation of Code § 18.2-95, and felony eluding, in violation of Code § 46.2-817. This appeal followed.

## II. ANALYSIS

### A. Venue

Appellant argues that the trial court erred in not granting her motion to strike the evidence on the eluding offense because the Commonwealth had failed to prove venue.[5]

"On appeal, we review 'whether the evidence, when viewed in the light most favorable to the Commonwealth, is sufficient to support the [trial court's] venue findings.'" Williams v. Commonwealth, 289 Va. 326, 336 (2015) (alteration in original) (quoting Cheng v. Commonwealth, 240 Va. 26, 36 (1990)).

"In a criminal prosecution, it is the Commonwealth's burden to establish venue." Bonner v. Commonwealth, 62 Va. App. 206, 210 (2013) (*en banc*). As venue is not a substantive element of a crime, the Commonwealth is not required to "prove where the crime occurred beyond a reasonable doubt." Id. (quoting Morris v. Commonwealth, 51 Va. App. 459, 469 (2008)). In order to establish venue, the Commonwealth must "produce evidence sufficient to give rise to a 'strong presumption' that the offense was committed within the jurisdiction of the court." Id. at 211 (quoting Cheng, 240 Va. at 36).

> The failure to clearly prove venue is usually due to inadvertence, flowing naturally from the familiarity of court, counsel, witnesses, and jurors with the locality of the crime; therefore, this Court will generally and properly lay hold of and accept as sufficient any evidence in the case, direct or otherwise, from which the fact may be *reasonably* inferred.

Williams, 289 Va. at 336 (quoting Randall v. Commonwealth, 183 Va. 182, 187 (1944)).

---

[5] Although the issue of venue "is properly raised by a motion to dismiss the indictment," our Supreme Court has "impliedly upheld the use of a motion to strike the evidence to challenge venue." Williams v. Commonwealth, 289 Va. 326, 330 n.3 (2015). Further, as in Williams, the Commonwealth here does not challenge the manner in which venue was raised as a procedural bar. See id.

In the absence of a specific statutory provision addressing venue, Virginia's general venue statute, Code § 19.2-244, "dictates the proper venue for an offense." Bonner, 62 Va. App. at 211-12. That statute states, in pertinent part, "the prosecution of a criminal case shall be had in the county or city in which the offense was committed." Code § 19.2-244(A).

Appellant was convicted of felony eluding, in violation of Code § 46.2-817(B). That code section provides, in pertinent part, as follows:

> Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person is guilty of a Class 6 felony.

Code § 46.2-817(B).

Contrary to appellant's argument that the Commonwealth's evidence did not establish venue in Appomattox County, the evidence, when viewed in the light most favorable to the Commonwealth, was sufficient to support the trial court's venue finding. In the instant case, Iannaco testified that her home was located on Old Grist Mill Road in Appomattox County. Iannaco stated that after the incident she saw appellant and her codefendants drive down her driveway in a red Mitsubishi vehicle and then exit the driveway. Deputy Burton went to investigate a home invasion/robbery reported at Iannaco's home, and when he arrived at the reported location he saw the vehicle "right there just below the driveway." The deputy immediately activated his blue emergency lights and positioned his police vehicle on Old Grist Mill Road in order to attempt to stop the vehicle. Appellant disregarded this visible signal from law enforcement to bring her car to a stop. Instead, she drove onto the grassy shoulder of the road, traveled around Deputy Burton's vehicle, and proceeded down Old Grist Mill Road at a high rate of speed. Burton testified that he pursued the car, activated his siren when he caught up with it after approximately one-half mile, and then pursued the car for several more miles

"through the back roads there." When asked if the "back roads [were] . . . your typical back roads out in the *county*," Burton replied, "[y]es, very curvy, you know, narrow, very curvy roads, sharp turns." (Emphasis added).

Thus, the evidence showed that appellant drove a vehicle down the driveway from the victim's residence, which was located in Appomattox County, and almost immediately encountered Deputy Burton after leaving the driveway and entering Old Grist Mill Road. Further, Deputy Burton affirmed that he pursued the vehicle on "county" roads. This evidence was sufficient to raise a "strong presumption" that appellant's conduct in Appomattox County interfered with or endangered the operation of the law-enforcement vehicle or a person. Accordingly, the trial court did not err in refusing to grant appellant's motion to strike the eluding charge.

## B. Application of the Single Larceny Doctrine

Appellant further argues that the trial court erred in denying her motion to strike the grand larceny of a firearm offense because her actions constituted one larceny under the single larceny doctrine.

> Whether the larceny of multiple items at or about the same time from the same general location constitutes a single larceny or multiple offenses is an issue that most courts have addressed early in the development of their criminal jurisprudence. The concept is commonly referred to as the "single larceny doctrine." The principles are easily stated and understood, but application of the doctrine becomes problematic when applied to the infinite variety of circumstances that can arise.

Richardson v. Commonwealth, 25 Va. App. 491, 495 (1997) (*en banc*) (citation omitted). "The overriding principle behind the single larceny doctrine is to prevent the state from aggregating multiple criminal penalties for a single criminal act." Id. at 496. Accordingly, we have recognized that "[a] series of larcenous acts will be considered a single count of larceny if they 'are done pursuant to a single impulse and in execution of a general fraudulent scheme.'" Acey

v. Commonwealth, 29 Va. App. 240, 247 (1999) (quoting West v. Commonwealth, 125 Va. 747, 754 (1919)).  In determining whether this doctrine applies, we consider the following factors: "(1) the location of the items taken, (2) the lapse of time between the takings, (3) the general and specific intent of the taker, (4) the number of owners of the items taken and (5) whether intervening events occurred between the takings."  Id.  "The primary factor to be considered is the intent of the thief and the question to be asked is whether the thefts . . . were part of one impulse."  Richardson, 25 Va. App. at 497.  See also Millard v. Commonwealth, 34 Va. App. 202, 207 (2000) (noting that "multiple unlawful takings constitute separate larcenies if the thief acted upon a separate intent or impulse for each theft").

As the doctrine's applicability is dependent upon the specific facts of each case, and primarily upon the intent of the thief, this Court "will affirm the trial court's determination unless plainly wrong or unless the record lacks any evidence to support that determination."  Bragg v. Commonwealth, 42 Va. App. 607, 612 (2004) (citation omitted)).

Appellant contends that the single larceny doctrine applies in this case because the two larcenies occurred in a short window of time within the same home, and because the evidence did not establish that she possessed two separate criminal intents—one for the firearms, and one for the personal property.  Appellant relies on Richardson and Acey to support her argument that the doctrine applies.

However, the facts in this case are distinguishable from both Richardson and Acey.  In Richardson, defendant stole two purses from locations within a hospital nurses' station that were separated by approximately ten feet.  Richardson, 25 Va. App. at 494.  This Court held that the single larceny doctrine applied because "[t]he theft of the two purses occurred at approximately the same time, from the same room or location, and pursuant to a single impulse or design to steal items from that nurses' station."  Id. at 498.  Further, we held that "[t]he fact that the purses

were separated by ten feet and that the thief had to walk around a wall from the desk to the cabinet [were] not circumstances that break the continuity of the thief's single and continuing act of thievery." Id. In Acey, this Court held that the single larceny doctrine applied because defendant took three firearms that were "within a few feet of each other" in the same room, and "[t]here was no appreciable lapse of time between the takings, only time enough for defendant to step from the closet, to the dresser and then to the headboard of the bed." Acey, 29 Va. App. at 247-48. This Court further found that "[d]efendant's intent . . . was to steal the weapons, but there [was] no indication he formed this intent separately for each item. Rather, his actions show he was motivated by one compulsion to steal." Id. at 248. This Court held that there were no "intervening events [that] took place between the takings." Id.

Here, the trial court found that one distinct larceny occurred when appellant removed electronics from the home, and the second distinct larceny occurred when Pollard and Octavius Wells took the rifle from Neighbors in the bedroom. The evidence adduced at trial supports this finding. Although the two incidents occurred in the same house, they occurred in different rooms of the house, by different people, and at different times. Appellant removed the video game items and television from the living room and left the residence several times to take the items to the car. Wells and Pollard stayed in the residence and subsequently took the rifle from Neighbors. These facts show that in this case, unlike Acey, there were "intervening events" that occurred between the two events. Furthermore, the trial court could reasonably infer that appellant's intent to steal the items from the living room was not the same intent as Pollard's and Wells' intent to steal the rifle from Neighbors, especially so in this case because the thefts were

committed by different perpetrators against different victims.[6] This distinguishes the present case from Richardson, in which it was clear that defendant possessed the singular intent to steal purses from the same nurses' station. Therefore, we hold that contrary to appellant's arguments, the trial court did not err in rejecting the applicability of the single larceny doctrine and convicting her of grand larceny and grand larceny of a firearm.

### III. CONCLUSION

We hold that trial court did not err either in denying appellant's motion to strike regarding venue, or in denying her motion to strike the second-charged larceny because of the single larceny doctrine. Accordingly, we affirm.

<u>Affirmed.</u>

---

[6] We note that appellant was guilty as a principal in the second degree of the larceny of the rifle taken by Octavius Wells and Pollard, despite the fact that she did not actually take the rifle from Neighbors, based upon the concert of action doctrine. See Rollston v. Commonwealth, 11 Va. App. 535, 543 (1991) ("[E]veryone connected with carrying out a common design to commit a criminal act is . . . bound by the act of any member of the combination, perpetrated in the prosecution of the common design. But it is not necessary that the crime committed shall have been originally intended." (quoting Boggs v. Commonwealth, 153 Va. 828, 836 (1929))); see also Code § 18.2-18 (providing that one who acts as a principal in the second degree to a felony "may be indicted, tried, convicted[,] and punished in all respects as if a principal in the first degree").